## WICKHAM *v.* TORLEY.

1. The mere fact that a minor has neither parent nor guardian does not remove his disability and clothe him with the power to contract generally.
2. Nor does the fact that such a minor has been engaged as a workman in a shop and receiving his wages in such employment empower him to contract generally.
3. If a "minor receives property, or other valuable consideration, and, after arrival at age, retains possession of such property, or enjoys the proceeds of such valuable consideration, such a ratification of the contract shall bind him."
4. Under the facts of this case the court erred in refusing to allow the plaintiff to reopen the case, after the evidence for the plaintiff was closed, and to introduce the defendant as a witness in order to prove by him facts which would have prevented a nonsuit.

JULY 14, 1911.

Complaint. Before Judge Charlton. Chatham superior court. April 7, 1910.

Marie Wickham brought an action against Arthur Torley, the

substance of the petition now material being as follows: Plaintiff, in the early part of June, 1908, was living with S. S. Sollee. Shortly thereafter the defendant, her brother, entered with Sollee into the business of raising pigeons for market, and has continued in such business since that time. Soon after the defendant engaged in such business he requested the plaintiff to lend him $1,000, stating at the time that it was to be used for the purpose of increasing and improving the business in which he had engaged with Sollee. Plaintiff thereupon loaned the defendant $1,000, upon his agreement to repay such sum in April, 1909. Defendant expended a large portion of such borrowed money in improving and increasing the pigeon business in which he was engaged with Sollee, and the defendant failed and refused to repay the loan upon demand after its maturity. The defendant pleaded that he never borrowed the $1,000 from the plaintiff, but he had received that sum from her as a gift; and he further pleaded, if it was not a gift but a loan, that he was a minor at the time he received the money, and was therefore not liable for its repayment.

Upon the trial the plaintiff testified, in substance, as follows: I loaned my brother, the defendant, $1,000 in June, 1908. He was 20 years old at that time. Our father and mother were both dead, and neither of us has ever had a guardian. He "wanted to go into the pigeon business with Mr. Sollee, and asked me to loan him $1,000; he then said that he would pay it back to me when he became 21 years old, on the 12th of April of the next year. This conversation took place in June of 1908, and I consented then to let him have the money." Mr. Sollee had my money, and he "as well as my brother suggested that I make the loan, but my brother himself made the application for the loan." The latter subsequently informed me that Mr. Sollee had furnished him with the $1,000, my money. No writing was given me by my brother for the loan. After the loan was due I made a demand on him for the money, but he has never paid me any of it. "After this money had been loaned to my brother, there were pigeons and a pigeon business, at the residence of Sollee. He bought pigeons. They appeared to be making a lot of improvements around the place and building a new pigeon-loft; this business of making improvements and building the pigeon-house continued while I remained there," which was until August, 1908. "Mr. Sollee and my brother were

in business together, and that's why my brother asked me to lend him the money, he wanted to go in business with Sollee. . . I saw certain improvements going on around the place, and I understood from the way he asked me to lend him the money, I thought probably that was what it was for; he told me he wanted to go in business with Mr. Sollee, and I presumed that these improvements were made with that money. . . After my brother came out to Mr. Sollee's, both Sollee and my brother told me that they were going into the business of raising pigeons; they said this before I loaned the money, and afterwards my brother said that he wanted to borrow the money to go into that business. I believe at one time while I was out there they had young pigeons." Before I loaned the money to my brother he was working with the Seaboard Railway Company, "learning to be a blacksmith," and was receiving $15 a month for his services.

Helmy testified, in behalf of the plaintiff, that he worked on Butner's farm near Sollee's place, and was there frequently. He said: "I recall an occasion when pigeon-roosts were hauled through Mr. Butner's place, but I don't remember the day. I saw them haul a wagon-load of boxes. . . Some kind of crates. I understand they were pigeon-nests. A darkey was doing the hauling, and he drove up through Mr. Butner's cow lane, leading out through the road. I objected to his going through there, when Mr. Torley came up and asked me to let the wagon cut through the lane up to the house, stating that it would ruin these boxes to get wet. Upon the request of Mr. Torley I allowed the boxes to go through. . . All that I have heard Torley say was that he was raising pigeons, and raising some to sell. He then told me he had made away with some of the pigeons, and only saved a few for his own use. This conversation occurred last fall or summer. [The trial was in April, 1910.] He did not say they were for the business, only for pigeon-nests. . . Mr. Torley did not tell me what his interest, if any, was, or whose pigeons they were; when he spoke about anything, it was about his doing so and so, and generally said we did so and so. I don't know who 'we' was; I could not say who he had been talking about; sometimes I would say, 'How are you getting along about the pigeon business?' and then he would say, 'We are doing nicely.' I could not pretend to say how long ago that was. I do not remember."

Upon the conclusion of the evidence for the plaintiff, the defendant moved for a nonsuit. "Before the judgment of the court was rendered upon said motion, plaintiff moved the court that she be permitted to introduce, for the purpose of avoiding the nonsuit, her brother, the said defendant, and then offered to show by said defendant the following facts: 1. That said defendant was now the owner of the property for which a large portion of said $1,000 had been paid. 2. That he was now in possession of that property. 3. That he was also in possession of a large portion of the money that had been loaned to him by plaintiff. 4. That he, at the time the money was loaned, was sui juris. The court, after argument, entered its judgment awarding a nonsuit, and then and there, upon objection of defendant, refused to allow plaintiff to introduce said defendant Torley for the purposes aforesaid." Plaintiff excepted to the judgment of nonsuit, on the ground that the evidence submitted in her behalf established a prima facie case against the defendant, and assigned error also upon the refusal of the court to permit plaintiff to introduce the defendant as her witness for the purpose of proving by him the facts as above stated.

*D. H. Clark,* for plaintiff.

*C. V. Hohenstein* and *S. N. Gazan,* for defendant.

FISH, C. J. (After stating the facts.)

1. "The contracts of a minor under twenty-one years of age are void, except for necessaries. . . If, however, the minor receives property, or other valuable consideration, and, after arrival at age, retains possession of such property, or enjoys the proceeds of such valuable consideration, such a ratification of the contract shall bind him." Civil Code (1910), § 4233. "If a minor, by permission of his parent or guardian, or by permission of law, practices any profession or trade, or engages in any business as an adult, he shall be bound by all contracts connected with such trade, profession, or business." Ib. § 4235. One of the contentions of counsel for the plaintiff is that as the defendant, at the time he made the contract sued on, had neither parent nor guardian, he was free to make the contract, and that it was therefore binding upon him, notwithstanding his infancy. This contention, however, will not hold. Until majority the child remains under the control of the father, who is entitled to his services and the proceeds of his labor. This parental power may be lost in several ways, as is pre-

scribed in Civil Code (1910), § 3021. But even emancipation of the minor from parental control only gives him a right to his own earnings and releases him from his parent's control from that time, but it does not remove his disability and clothe him with the power to contract. 2 Page on Contracts, § 852; Clarke on Contracts, 150. It must follow that if an infant after the loss of parental control has no capacity to make a binding contract, the mere fact that he had neither parent nor guardian would not operate to confer upon him the power to contract. Nor would the mere fact that the defendant, having neither parent nor guardian, was working for himself and receiving his own wages, prior to the time the contract sued on was entered into, render him capable of making such contract, which was entirely disconnected with the work for which he was receiving his earnings. Another contention of counsel for the plaintiff is that the evidence submitted in behalf of the plaintiff authorized a finding that the defendant, at the time he borrowed the money, was engaged as an adult in the business of raising pigeons for sale and that the contract sued on was connected with such business. We can not agree to this. According to the testimony of the plaintiff herself, the defendant was not engage in such business at the time she loaned him the money, but he borrowed it for the purpose of embarking in such a business, and there was no sufficient evidence to show that any of the money he borrowed was ever invested in such business. Our conclusion is that the plaintiff failed to make out a prima facie case.

2. Did the court err in refusing to permit the plaintiff, in order to save a nonsuit, to introduce the defendant and prove by him that he was then in the possession of and owned the property in which a large portion of the money he had borrowed from the plaintiff had been invested, and that he was also then in possession of a large portion of the borrowed money? The rulings of this court relating to this question have been collated by Justice Lumpkin in *Penn v. Georgia Southern & Florida Railway Co.*, 129 Ga. 856 (60 S. E. 172), and, as was there said, "among these decisions there is no conflict, but, construed together, they are in harmony and make up a complete rule. It is common practice for the presiding judge, where counsel for the plaintiff in error has omitted evidence by accident, inadvertence, or even because of a mistake as to the necessity for offering a particular witness or particular evidence,

to allow the case to be reopened and additional evidence introduced in order to prevent a nonsuit. But this is not a matter of arbitrary right on the part of the plaintiff or his counsel. The judge has a considerable discretion in the matter. It may be that counsel for a defendant has dismissed witnesses or changed his position, relying on a judge's announcement, so that it would be unjust to allow a reopening of the case. Or the judge may be of the opinion that counsel are needlessly consuming time and experimenting in the case rather than developing it; or other reasons may influence him, in the exercise of a sound discretion, in refusing a motion to reopen the case and allow additional testimony." In the present case it appears that counsel for the plaintiff might have well contended in good faith that the evidence for the plaintiff made out a prima facie case. In the present case there appears no reason why it would have been unjust to the defendant to have allowed the plaintiff to reopen the case. The plaintiff offered the defendant himself to prove additional facts to make out a case. Nothing appears to authorize the conclusion that counsel was needlessly consuming time and experimenting in the case rather than developing it. Certainly the plaintiff could not be expected to introduce the defendant as a witness in order to make out a case except in dire necessity. In the present case we think the plaintiff might well have rested the case on the evidence submitted on behalf of the plaintiff until the judge had intimated his intention to grant a nonsuit. On such intimation, then the necessity arose for the plaintiff to introduce her adversary as a witness. We are of opinion that the court erred in not allowing her to do so. This rule is not in conflict with the decisions in *Cushman* v. *Coleman*, 92 *Ga.* 772 (19 S. E. 46), *Freyermuth* v. *South Bound R. Co.*, 107 *Ga.* 31 (32 S. E. 668), *Davis* v. *Chaplin*, 110 *Ga.* 322 (35 S. E. 312), and *Brooke* v. *Lowe*, 122 *Ga.* 358 (50 S. E. 146), when the facts of those cases are construed in connection with the rulings made. The plaintiff offered to show by the defendant that he was, even at the time of the trial, in possession of and the owner of the property in which a large portion of the borrowed money had been invested, and that he was then in possession of a large part of the borrowed money. If this had been shown, then without more it would have authorized a recovery under the Civil Code (1910), § 4233, which provides, "if . . the minor receives property, or

other valuable consideration, and after arriving at age retains possession of such property or enjoys the proceeds of such valuable consideration, such a ratification of the contract shall bind him." *White* v. *Sikes,* 129 *Ga.* 508 (59 S. E. 228, 121 Am. St. R. 228). The court erred in refusing to allow the plaintiff to introduce additional evidence offered in order to avert a nonsuit.

<div align="center">

*Judgment reversed. All the Justices concur.*